UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | |
|---|---|
| THE CIT GROUP/COMMERCIAL SERVICES, INC., <br><br> Appellant, <br><br> v. <br><br> CONSTELLATION ENERGY COMMODITIES GROUP, INC., et al., <br><br> Appellees. | Civil No. 13-88-ART <br><br> **MEMORANDUM OPINION & ORDER** |

\*\*\* \*\*\* \*\*\* \*\*\*

This case arises from a tangled web of commercial agreements. Three sophisticated parties executed and breached a series of written and unwritten contracts, leaving one party bankrupt and the other two fighting over its corpse in bankruptcy. Although the contractual background is complicated, this appeal from the bankruptcy court raises a straightforward legal question: when a contract vests a party with a defense, may that party assert its defense against its contractual partner's assignee? Under New York law, the answer is a resounding "yes."

## BACKGROUND

The Court rehearsed this case's history in detail in its prior opinion. *See The CIT Grp./Comm. Servs., Inc. v. Constellation Energy Commodities Grp.*, Civil No. 12-16-ART, 2012 WL 4603049, at \*1–7 (E.D. Ky. Sept. 30, 2012) ("*CIT I*"). For present purposes, a brief summary will suffice. In 2006, Black Diamond, Inc., ("Black Diamond") agreed to sell coal to Constellation Energy Commodities Group, Inc. ("Commodities"). *Id.* at \*1. Shortly

after executing its contract with Commodities, Black Diamond assigned its right to receive payments for the coal to The CIT Group ("CIT"). *Id.* So the basic scheme was simple: Black Diamond sold coal to Commodities, and Commodities paid CIT.

Black Diamond and Commodities carried on their relationship through both written and unwritten contracts. *See id.* at *13. Their written agreements each contained a so-called "netting" provision. *See, e.g.*, B.R. 119-6 at 16.[1] That provision allowed the parties to "net" mutual debts to avoid redundant payments. *See id.* ("All amounts owed by each Party[] to the other Party . . . shall be netted so that only the net difference between such amounts shall be payable by the Party who owes the greater amount."). So, if Black Diamond owed Commodities $200,000, and Commodities owed Black Diamond $100,000, then the contract required only a single $100,000 payment by Black Diamond. *See id.* ("[O]nly the net difference between such amounts . . . shall be payable"). It is undisputed that the unwritten agreements included an identical netting provision. *See* B.R. 240 at 27.

The wheels came off the wagon in early 2008. Black Diamond failed to fulfill its obligations to both Commodities and CIT, and CIT forced Black Diamond into bankruptcy. *CIT I* at *6. Black Diamond's bankruptcy constituted a breach of its agreements with Commodities. B.R. 119-6 at 13. That breach forced Commodities to buy coal at much less favorable prices than those contemplated by its contracts with Black Diamond, resulting in damages of around $90,000,000. *CIT I* at *6 & n.9.

This suit arises from one of the last transactions that preceded Black Diamond's bankruptcy. In December 2007, Commodities purchased a shipment of coal from Black

---

[1] "B.R." indicates a citation to the record of the Bankruptcy Court in *The CIT Grp./Comm. Servs., Inc. v. Constellation Energy Grp.*, No. 08-7017, 2011 WL 6202905 (Bankr. E.D. Ky. Dec. 13, 2011).

Diamond pursuant to an unwritten contract for roughly $10,000,000. *Id.* at *12–13. Commodities never paid for the coal. The question presented here is whether Commodities may "net" that $10,000,000 against the $90,000,000 it lost as a result of Black Diamond's declaration of bankruptcy. If so, then Commodities owes CIT nothing, as it can simply subtract that $10,000,000 dollars from the $90,000,000 it is owed. If not, then Commodities must pay CIT.

The Bankruptcy Court granted summary judgment to Commodities, and CIT appealed. *See* R. 1; R. 1-2 at 18. This Court reviews the Bankruptcy Court's award of summary judgment *de novo*. *In re National Century Financial Enterprises, Inc.*, 377 F. App'x 531, 535 (6th Cir. 2010). Summary judgment is appropriate where no genuine issue of material fact remains for trial, such that one party is entitled to judgment as a matter of law. *Id.* ("Federal Rule of Civil Procedure 56 applies to motions for summary judgment in adversary proceedings in bankruptcy court."); Fed. R. Bankr. P. 7056. *Id.* For the reasons explained below, the Bankruptcy Court's judgment is affirmed.

## DISCUSSION

An assignee stands in the shoes of his assignor. This is true as a matter of logical necessity: an assignor can give away no more than he has, so he cannot improve the terms of his contract by assigning it to a third party.[2] *See e.g.*, *Septembertide Publ'g B.V., v. Stein and Day, Inc.*, 884 F.2d 675, 682 (2d Cir. 1989) ("It is elementary ancient law that an assignee never stands in any better position than his assignor. He is subject to all the equities and burdens which attach to the property assigned because he receives no more . . . than his assignor.") (quoting *Int'l Ribbon Mills, Ltd. v. Arjan Ribbons, Inc.*, 36 N.Y.2d 121, 126

---

[2] As noted in this Court's prior opinion, New York law governs this dispute. *CIT I* at *7.

3

(1975)); *see also Commerce Bank, N.A. v. Chrysler Realty Corp*, 244 F.3d 777, 783 (10th Cir. 2001) (explaining that "a transferee's rights are no better than those held by his transferor," so an assignee's right to receive funds is contingent on its assignor's right to be paid). The rule is not only ancient but also eminently sensible: if a party could nullify contractual defenses by assigning away its contractual rights, then such defenses would be worthless. *See, e.g.*, *Banque de Paris et des Pays-Bas v. Amoco Oil Co.*, 573 F. Supp. 1464, 1470 (S.D.N.Y. 1983).

Unsurprisingly, that principle is reflected in New York's Uniform Commercial Code: "[T]he rights of an assignee are subject to . . . all terms of the agreement between the account debtor and the assignor . . . ." N.Y.U.C.C. § 9-404(a); *see General Elec. Credit Corp. v. Xerox Corp.*, 112 A.D.2d 30, 31 (N.Y. App. Div. 1985) (interpreting the predecessor provision of the U.C.C. and holding that "the rights of an assignee are *subject to any defenses or claims arising out of the contract between the account debtor and the assignor*") (emphasis added). Therefore, an assignor's original contractual partner may assert against an assignee any contractual defenses he has against the assignor. *See* N.Y.U.C.C. § 9-404(a)(1); *Xerox Corp.*, 112 A.D.2d at 31; *see also* Restatement (Second) of Contracts § 336 cmt. b ("The assignee's right . . . is subject to limitations imposed by the terms of [the] contract and to defenses *which would have been available had there been no assignment*.") (emphasis added).

That legal background makes this an easy case because the parties agree that the unwritten contract governing the December 2007 coal shipments included the netting provision. *See* B.R. 240 at 27. If Black Diamond had never assigned its right to payment, then Commodities could have netted its $10,000,000 debt against Black Diamond's

$90,000,000 breach. *See* B.R. 119-6 at 16 ("All amounts owed by each Party to the other Party . . . shall be netted so that only the net difference between such amounts shall be payable by the Party who owes the greater amount . . . ."). So, under the terms of the agreement, the only amount "payable" at the time Black Diamond entered bankruptcy was Black Diamond's remaining $80,000,000 debt to Commodities. That Black Diamond assigned its right to payment under the contract changes nothing. As the authorities cited above demonstrate, CIT's right to payment is contingent upon the assignor's right to be paid, because Commodities may assert against CIT (the assignee) all contractual defenses contained in the "terms of [its] agreement" with Black Diamond (the assignor). N.Y.U.C.C. § 9-404(a). Here, that means Commodities may assert $90,000,000 worth of contractual defenses against CIT's $10,000,000 claim.

CIT offers two arguments against this straightforward resolution of the case: (1) that the netting provision applies only to debts owed by Black Diamond and Commodities to each other, so that it has no effect on the rights of an assignee, R. 12 at 36–37; R. 25 at 7 n.6, and (2) that Commodities forfeited its right to invoke the netting provision by breaching the contract before Black Diamond did, R. 12 at 34–35. Neither argument is persuasive.

## I. Commodities' Netting Defense Applies Regardless of CIT's Assignment

CIT's main argument against Commodities' netting defense—and the only one it deploys in its supplemental brief—is that the netting provision applies to transactions between Black Diamond and Commodities only. R. 12 at 36–37; R. 25 at 7 n.6 ("The portions of § 16 that refer to 'netting' speak exclusively in terms of mutual debts between the parties to the Coal Supply Agreement."). Therefore, CIT says, Commodities was free to net its obligations to Black Diamond, but Commodities could not net its obligations to CIT

5

against Black Diamond's debts. *See id.*

CIT's argument ignores the principle described above: that an assignor cannot give away more than he has. *E.g.*, *Septembertide*, 884 F.2d at 682 ("It is elementary ancient law that an assignee never stands in any better position than his assignor."). Black Diamond assigned to CIT its right to receive payments under the contract. According to the contract's netting provision, the only amount "payable" to Black Diamond was the net difference between its debts to Commodities and Commodities' debts to Black Diamond. B.R. 119-6 at 16 ("All amounts owed by each Party to the other Party . . . shall be netted so that *only the net difference between such amounts shall be payable* by the Party who owes the greater amount . . . .") (emphasis added). The contract thus did not require Commodities to pay debts that it was entitled to net: Black Diamond had no right to receive such payments, because they were not "payable." *Id.*

Black Diamond could not have assigned a right it never had, nor did its assignment to CIT somehow negate the effect of the netting provision. N.Y.U.C.C. § 9-404(a) ("[T]he rights of an assignee are subject to . . . all terms of the agreement between the account debtor and the assignor . . . ."); *see Xerox Corp.*, 112 A.D.2d at 31 ("[T]he rights of an assignee are *subject to any defenses or claims arising out of the contract between the account debtor and the assignor*.") (emphasis added). Commodities' rights under the netting provision determine the amount "payable" under the contract. That is so regardless of whether Commodities owed its payments to Black Diamond or CIT, as all CIT received from Black Diamond was the right to receive payments due under the contract. The netting provision thus applies regardless of Black Diamond's assignment to CIT.

**II.     Commodities Did Not Forfeit Its Rights Under the Netting Provision**

In the alternative, CIT argues that Commodities forfeited its netting rights by breaching the agreement. R. 12 at 34–35. According to CIT, Commodities breached the agreement by failing to pay for the December coal shipment by January 21, 2008. That breach, CIT says, triggered Black Diamond's right to demand immediate payment of all Commodities' outstanding debts—regardless of the netting provision.

The contract does contemplate such a remedy. Assuming Commodities breached the agreement (by committing what the contract refers to as an "Event of Default"), then Black Diamond had the right to terminate the agreements by declaring an "early termination date" and giving written notice to Commodities. If Black Diamond elected to terminate the agreement, then it also would have had the right to receive from Commodities all payments due under the contract, regardless of Commodities' netting rights. *See* R. 119-6 at 14 ("[N]otwithstanding any provision to the contrary contained in this Agreement [i.e., the Netting provision], the non-Defaulting Party [Black Diamond] may withhold any payment otherwise owed to the Defaulting Party [Commodities] hereunder, until . . . *all amounts due and payable as of the Early Termination Date by the Defaulting Party . . . have been fully and finally paid*.") (emphasis added).

The problem for CIT is that it is undisputed that Black Diamond never exercised its right to declare an early termination date. Commodities could only have lost its netting rights if Black Diamond decided to terminate the contract: the entire provision upon which CIT relies is located in the portion of the contract that describes the procedures for declaring an early termination date. Indeed, the sentence CIT focuses on demonstrates that the forfeiture of netting rights is intimately connected with the early termination date. *See id.*

7

(requiring the non-defaulting party to pay, without netting, all payments due "*as of the Early Termination Date.*") (emphasis added). Because Black Diamond did not declare an early termination date, this portion of the contract does not apply to this case, and CIT cites no other section of the contract that would deprive Commodities of its netting rights.

## III. Commodities' Common Law Rights:  Setoff and Recoupment

Commodities invokes two other legal doctrines in support of its claim that it need not pay for the December 2007 coal shipment:  its common law rights to setoff and recoupment, which the contract preserved. R. 24 at 2; *See* B.R. 119-6 at 16 ("Each party reserves to itself all rights . . . and defenses which such Party has or may be entitled to (by operation of law or otherwise).  All payment obligations . . . may be offset against each other, set off or recouped."). The Court need not address those arguments, however, because Commodities' contractual netting rights suffice to decide the case in its favor.

## CONCLUSION

Commodities had the right to net its obligations to Black Diamond against Black Diamond's debts.  Only the difference between those amounts was "payable" under the contract.  When Black Diamond assigned its rights to receive payments under the contract to CIT, CIT received no more than what Black Diamond had.  For the reasons explained above, Commodities was entitled to net Black Diamond's $90,000,000 breach against the $10,000,000 cost of the December 2007 coal shipment.  Accordingly, that $10,000,000 was not "payable" under the contract after CIT forced Black Diamond into bankruptcy.  Black Diamond could not have assigned the right to receive a payment to which it was not entitled.

Accordingly, it is **ORDERED** that the Bankruptcy Court's judgment, R. 1-3, is **AFFIRMED**.

This the 30th day of January, 2014.

Signed By:
*Amul R. Thapar* AT
United States District Judge